## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION,<br><br>     Plaintiff,<br><br>          vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>     Defendant. | No. 2:20-cv-00422 (JAW)<br><br>DECLARATION OF ELLIOT VIKER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

I, Elliot Viker, state as follows:

1.     I am Acting Associate Center Director and FOIA Officer in the Freedom of Information and Privacy Act (FOIA/PA) Unit, National Records Center (NRC), United States Citizenship and Immigration Services (USCIS), within the United States Department of Homeland Security (DHS), in Lee's Summit, Missouri.  I have held the position of Acting Associate Center Director since November 11, 2021.  I previously served as Chief of Operations for the USCIS FOIA program from June 2018 through November 2021.  In 2020, I was named the DHS FOIA Professional of the Year.   I have served as a Supervisory Government Information Specialist since June of 2006.

2.     As Acting Associate Center Director and FOIA Officer for USCIS, I supervise over 200 information access professionals who are responsible for the orderly processing of all public, congressional, judicial, and inter-/intra-agency requests or demands for access to USCIS records and information pursuant to the FOIA, Privacy Act, Executive Orders, departmental directives, regulations, and compulsory legal process.

3.     Through the exercise of my official duties as Acting Associate Center Director and FOIA Officer, I am familiar with USCIS's standard process for responding to FOIA

requests, including search procedures for locating agency records.  More specifically, I am familiar with USCIS's procedures and actions taken in response to the FOIA request at issue.

4.      This declaration is submitted in support of Defendant's Motion for Summary Judgment.  This declaration describes, generally, agency procedures for searching for records responsive to FOIA requests for access to agency records and, more specifically, agency action taken in response to the FOIA request submitted by Plaintiff American Civil Liberties Union of Maine Foundation ("Plaintiff" or "ACLU of Maine").  The statements contained in this declaration are based on my personal knowledge, my review of relevant documents kept by USCIS in the course of ordinary business, and upon information provided to me by other USCIS employees in the course of my official duties.

## USCIS'S STANDARD FOIA OPERATING PROCEDURES

5.      USCIS routinely and consistently processes FOIA requests in compliance with DHS implementing regulations found at 6 C.F.R. Part 5 and Management Directive No. 0460.1.[1] Specifically, when the agency receives a FOIA request for USCIS information or documents, the agency's standard procedure includes the following:

> a.  after determining the nature, scope, and contours of a valid FOIA request, a preliminary search is conducted to locate potentially responsive records;
>
> b.  because FOIA requests are generally processed by the NRC on a first-in/first-out basis, the request is logged in the approximate order of its

---

[1] DHS requirements for submitting a FOIA request for an individual's records include the following:

1.  All FOIA requests must be submitted in writing and signed by the requester. 6 C.F.R. § 5.3(a).

2.  If the requester seeks records about him/herself the requester must verify identity by submitting, in writing, a statement containing his/her full name, current address, date of birth and place of birth.  This statement must be signed, and the signature must either be notarized or submitted under 28 U.S.C. § 1746 (penalty of perjury in lieu of notarized signature).  This signature must be submitted along with the FOIA request.  6 C.F.R. §§ 5.3(a), 5.21(d).

3.  The FOIA request must describe the records that are being sought in sufficient detail to enable DHS personnel to locate them with a reasonable amount of effort. 6 C.F.R. § 5.3(b).

receipt into a computerized case tracking and retrieval system which

automatically assigns a control number and tracks the file created;

c.  an acknowledgement letter is contemporaneously mailed to the requester,

advising of the control number, processing fee arrangement, processing

options, and contact information, and addressing any collateral requests

made by requester;

d.  during any abeyance in processing, periodic system inquiries are

conducted to maintain updated information concerning the disposition of

agency records that are subject to the pending FOIA request;

e.  if relevant records are in the possession of an office or agency other than

the responding office, a request for the production of the records is sent to

the records' custodian(s) for that office or agency;

f.  during the course of processing, the FOIA request and any responsive

records are subjected to rigorous analyses to arrive at the proper final

agency determination; and finally;

g.  the NRC sends its response to the requester, granting or denying, in whole

or in part, access to requested records, and advising of any additional

rights that may have vested in the requester by virtue of the final agency

determination.

6.      In recent years, USCIS has experienced a significant increase in the amount of

FOIA requests received and processed by the agency.  USCIS is only one of ninety-nine federal

agencies subject to the FOIA, but it receives more than one-fourth of the total requests received.

For example, during fiscal year ("FY") 2016, USCIS received 166,732 FOIA requests.  In FY

2020, that number increased to 195,731 requests received.  This volume represents nearly half of

the total requests received by DHS and over 25 percent of the total requests received government-wide in FY 2020. See http://www.foia.gov.

7.      Given the significant number of FOIA requests received by USCIS and in an effort to process FOIA requests in a manner designed to be fair and expeditious, USCIS has adopted a policy of processing such requests on a first-in/first-out basis.  This process is further enhanced by the implementation of a regulation providing for expedited processing of requests under given circumstances, and the adoption of a multi-track system of processing which not only allows the agency to process requests on a first-in/first-out basis within each track, but also permits the USCIS to respond to relatively simple requests more quickly than requests involving complex and/or voluminous records.   USCIS's first-in/first-out and multi-track processing is consistent with the requirements set forth in Open America v. Watergate Special Prosecution Force, 547 F.2d 605 (D.C. Cir. 1976) and Exner v. FBI, 612 F.2d 1202, 1980 U.S. App. LEXIS 20856, February 4, 1980.

8.      The majority of the FOIA/PA requests that USCIS receives seek immigration records located in an individual's Alien File (A-file).[2]   USCIS also receives a significant volume of requests seeking non A-file records, such as USCIS policy documents.

9.      The NRC's Significant Interest Group (SIG) team handles all FOIA/PA requests for non-alien file records on behalf of the agency.  Upon receipt of such a request, a SIG team reviews the request and determines its precise nature and scope, and any and all agency offices that may have potentially responsive records.

---

[2] An A-File and ELIS (Electronic Immigration System) make up the official government record that contain information regarding transactions involving an individual as he/she passes through the U.S. immigration and inspection process.  See 82 Fed. Reg. 43556 (September 18, 2017). The Alien File/Central Index System is a centralized and consolidated system of records through which A-Files are stored, maintained, updated, tracked, and retrieved.  Although USCIS is the official custodian of all A-Files and the system manager for the Alien File/Central Index System, both the files and systems are shared with U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, all of which create and contribute documents to A-Files. A-Files are maintained under and retrievable by reference to an individual's name and Alien number, and date of birth, or combination thereof.  Further information on A-Files is detailed later in this declaration.

10.     In order to accurately identify all offices that may have responsive records, the assigned SIG team will consult a variety of sources reflecting organizational and operational information about the agency and the different program offices and Directorates within USCIS and the specific missions and work of each office and Directorate.

11.     After a member of the SIG team has identified any and all agency offices that may have potentially responsive records, he or she then forwards the request to those offices for a search and response.  In addition to searching its own records, those offices are generally asked to identify any other agency offices that it believes could have potentially responsive records. The objective of this process is to devise and conduct a search that is reasonably calculated to uncover all potentially relevant and responsive records.

12.     Department of Homeland Security, of which USCIS is an agency, regulation provides that except for certain limited circumstances, "[i]n determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date that it begins its search." 6 C.F.R. § 5.4(a). USCIS adheres to this regulation in responding to FOIA requests.

## PLAINTIFF'S JULY 12, 2019 FOIA REQUEST

13.     On August 5, 2019, USCIS's FOIA office received a FOIA request dated July 12, 2019.  The request was submitted by Zachary Heiden, Esq., who submitted the request on behalf of Plaintiff ACLU of Maine.  The request also sought expedited processing and a fee waiver. See Exhibit A (July 12, 2019 FOIA Request).

14.     The records and information sought by Plaintiff in its FOIA request pertain to USCIS's obligation to enforce the immigration laws of the United States through its processing of applications and petitions submitted to USCIS by individuals seeking immigration benefits from the United States government.

15.     Specifically, Plaintiff's request sought "all records and documentation" related to "approvals, referrals, and denials of affirmative asylum cases arising out of the Newark Asylum Office and Boston Asylum Sub-Office, from January 1, 2010 until the present" including the following:

A.  Records regarding Data & Statistical Information of Affirmative Asylum Cases as handled by the Boston and Newark Asylum Offices

Any and all Records, excluding confidential information from individual Alien files, containing data or statistics prepared, compiled, or maintained or that which could readily be prepared, compiled, or maintained based upon information, records, or documentation in the Newark and Boston Asylum Offices' actual or constructive possession and/or control, pertaining to affirmative asylum interviews. Such Records include, but are not limited to:

a.     Case file information and Records for each affirmative asylum application processed by the Newark Asylum Office from January 1, 2010 to present and by the Boston Asylum Office from January 1, 2015 to present, sorted by I-589 receipt number, including all the following data associated with each application:

i.      State of U.S. residence at the time of application;
ii.     Asylum Office that adjudicated the application;
iii.    Country of origin;
iv.    Age at time of application;
v.     Gender;
vi.    Race;
vii.   Nationality;
viii.  Native Language;
ix.    Filing date of I-589 application;
x.     Date(s) of Request for Evidence, if any;
xi.    Date of interview;
xii.   Date of adjudication;
xiii.  Type of decision [approval, denial, referral (interview), referral (uninterviewed), filing deadline referral, case closed/no-show denial];
xiv.   Whether applicant had counsel present at the interview; and
xv.    Whether applicant had an interpreter present at the interview.

b.     Records regarding Supervisory Asylum Officers' returns and adjudicator logs underlying affirmative asylum denials, referrals, approvals, notices of intent to deny, and assessments to approve, deny, or refer from the Newark Asylum Office from January 1, 2010 until the present and the Boston Asylum Sub-Office since January 1, 2015, including assessments and reasonings regarding why returns were given and/or the reasons behind the resulting referrals and denials;

c.     Records regarding communications related to referrals, denials, approvals, notices of intent to deny, and assessments to approve, deny, or refer from the Newark Asylum Office from January 1, 2010 until the present and the

Boston Asylum Sub-Office since January I, 2015;

     d.     Any and all related Records not specifically outlined above.

B.  Records Related to the Policies, Procedures, and Objectives of the Boston and Newark Asylum Offices Regarding Affirmative Asylum Cases

     Any and all Records, received, maintained, or created by any governmental agency or subdivision, related to procedures, policies, or objectives of the Newark Asylum Office controlling the decision-making process of affirmative asylum cases from January I, 2010 until the present. Additionally, Requesters seek Records received, maintained, or created by any governmental agency or subdivision, as well as Records related to procedures, policies, or objectives from the Boston Asylum Sub-Office, including documents created on or after January 1, 2015. Records include, but are not limited to:

     a.     Overview Documents: Any and all Records referencing, discussing, detailing, explaining, or otherwise addressing the purposes, goals, objectives, responsibilities, implementation, and deployment strategy of the Boston or Newark Asylum Office's policies, procedures, and objectives regarding the affirmative asylum process.

     b.     Approval Notices, Referral Notices, Notices of Intent to Deny, and Denial Notices: Any and all Records regarding approval, denial (including notices of intent to deny), and referral notices that include the reasoning behind and communications regarding the approvals, referrals, denials, decisions, notices of intent to deny, and assessments to approve, deny, or refer, including redacted letters sent to affirmative asylum seekers, notices of intent to deny, internal and external emails and other Records regarding approval, denial, or referral notices and decisions, and any and all other Records addressing the approval, denial and referral decisions of affirmative asylum cases, including those Records between Supervisory Asylum Officers and Asylum Officers, excluding confidential information from individual Alien files.

     c.     Any and all Records related to policies and procedures governing the decisionmaking processes regarding affirmative asylum claims made by the Boston or Newark Asylum Offices. This includes, but is not limited to:

          i.     Any and all Records containing policies, objectives, or procedures governing granted, denied or referred affirmative asylum cases within the Boston and Newark Asylum Offices;

          ii.     Any and all Records containing standard notices, decisions, or computer screen shots generated in response to the ultimate decision rendered, excluding confidential information from individual Alien files.

          iii.     Any and all Records pertaining to employee performance-based assessments, including the criteria, rubric, policies, procedures, data, objectives, expectations, and any and all other similar matters pertaining to employee performance review, excluding confidential employee information:

          iv.     Any and all Records pertaining to the number of cases the Asylum Officer's recommendation was changed ( or where a different outcome was suggested) by the Supervisory Asylum Officer, broken down by country of origin, Asylum Officer, Supervisory Asylum Officer, and state of residence of the applicant, excluding confidential employee and Alien file

information;

v.        Any and all Records regarding the number of instances Asylum Officers have been penalized for Supervisory Officer returns of cases to the Asylum Officers and policies and directives behind such penalties given, excluding confidential employee information:

vi.        Any and all Records related to training or education regarding the assessment of the credibility of claims, the detection of fraud, and the Boston and Newark Asylum Offices' policies and procedures regarding decisions rendered on credibility grounds in affirmative asylum cases.

d.        Any and all Records containing training, briefing, guidance, procedures, rules, or other informational materials developed internally or externally pertaining to the job training, responsibilities, guidance, and rules for all employees at the Boston and Newark Asylum Offices, including, but not limited to:

vii.        Any and all Records containing required training, policies, procedures, and expectations relating to anti-bias and sensitivity training for employees working with trauma survivors;

viii.        Any and all Records related to evaluating, compiling, reviewing, or discussing the Boston and Newark Asylum Offices' racial or antiracial profiling policies and procedures.

e.        Any and all Records relating to the technological system used in case management, including applicable hardware, software, systems, applications, and any and all other technological systems utilized in managing, assessing, organizing, and evaluating affirmative asylum cases within the Asylum Office.

f.        Any and all Records pertaining to the size of the Boston and Newark Asylum Offices, number of cases, and employee workload. This includes, but is not limited to:

ix.        Any and all Records pertaining to the number of Asylum Officers and Supervisory Asylum Officers, per month;

x.        Any and all Records pertaining to the number of cases per month the Office has maintained, and the average caseload of each Asylum Officer and Supervisory Asylum Officer, per month;

xi.        Any and all Records showing changes in policies pertaining to employee caseloads, the average time employees have to review and adjudicate a specific case, directives or policies regarding the amount of time dedicated toward the assessment of a single case, average time recommended for the Asylum Officer to conduct affirmative asylum interviews, time constraints pertaining to case review, and any and all other information pertaining to the workload of Asylum Officers and Supervisory Asylum Officers, since January 2010.

g.        Any and all Records, including emails, messages (including electronic messaging and emails where the word "Maine" is used), memoranda, and any and all other similar documentation that involve Maine cases or include "Maine" in the subject line and/or body of the Record, excluding confidential information from individual Alien files.

h.        Any and all Records generated by the Boston or Newark Asylum Offices, pertaining to internal policies, procedures, guidance, rules, and

communications, written or electronic, governing affirmative asylum applicants and consequent decisions rendered from Angola, Burundi, the Democratic Republic of the Congo, and Rwanda, excluding confidential information from individual Alien files.

See Exhibit A (July 12, 2019 FOIA Request).

16.    On August 14, 2019, USCIS's FOIA office acknowledged receipt of the Plaintiff's FOIA request, and assigned case number COW2019500947 to the request. The letter informed the Plaintiff that USCIS/NRC responds to requests on a first-in, first-out basis and on a multi-track system, and that the request had been placed in the complex track (Track 2). The letter also informed Plaintiff that based on the information provided, USCIS had determined that expedited processing of the request was not warranted. The letter also advised Plaintiff of the right to file an administrative appeal within 90 days of the letter. See Exhibit B (August 14, 2019, USCIS FOIA Acknowledgement letter).

**USCIS'S SEARCH FOR RECORDS IN RESPONSE TO PLAINTIFF'S FOIA REQUEST**

17.    After reviewing Plaintiff's request, the NRC determined that the subject matter of the records sought focused primarily on policy records relating to affirmative asylum cases arising out of the Newark Asylum Office from 2010 through present and the same for the Boston Asylum Office from 2015 through present. See Ex. A at pp. 4-7. Accordingly, this request was assigned to the SIG team, who followed the USCIS's standard procedures for processing a FOIA request.

18.    Based on the SIG team's review of this request, they determined that documents responsive to the request would most likely be maintained by the following three USCIS offices:

    a.    USCIS's Refugee, Asylum, & International Operations (RAIO)

        Directorate: RAIO's mission is to leverage the agency's domestic and

        international presence to provide protection, humanitarian, and other

        immigration benefits and services throughout the world while combating

fraud and protecting national security.  RAIO is responsible for overseeing
USCIS's refugee and asylum policies, including policies relevant to the
adjudication of affirmative asylum cases.  Given the mission and nature of
RAIO's work, the USCIS FOIA office believed that RAIO might have
documents responsive to the request.  Further, RAIO is likely to have the
majority of the records responsive to this request, as it is the directorate
responsible for overseeing USCIS's asylum and refugee offices, including
the Boston and Newark Asylum Offices, which are the focus of the
requested records.

b.  USCIS's Office of Performance and Quality (OPQ):  OPQ's mission is to
preserve and enhance the quality of USCIS data by serving as stewards of
that data. Through the use of data collection, validation, and management
techniques, OPQ provides relevant and actionable datasets and analysis to
USCIS directorates and program offices, as well as to external
stakeholders from the department, administration, and public at large.
Given the mission and nature of OPQ's work, particularly its focus on data
collection, the USCIS FOIA office believed that OPQ might have
documents responsive to the request.

c.  The Office of Policy and Strategy (OPS):  OPS is responsible for the
development of agency policy and is involved in the decision-making
process, along with multiple levels of USCIS leadership.  Given the level
of involvement that OPS has with any issues involving USCIS policy, the
USCIS FOIA office believed that OPQ might have documents responsive
to the request.

19.    The SIG team forwarded the request to each office, and requested that staff in those offices who were likely to have responsive records conduct a search of their records for any responsive documents. Each office was provided with a copy of the request, which included the specific list of records sought by Plaintiff. Because each individual may have a different organization system or way of phrasing a topic that could be responsive, employees were instructed to read the request and use any search terms or phrases to search their files that would reasonably be calculated to locate any records responsive to the request. Additionally, each office was instructed to advise the FOIA office if any additional offices may have responsive records so that they could be asked to search as well. No additional offices beyond RAIO, OPQ, and OPS were identified.

20.    The following information was provided to the USCIS FOIA office from RAIO, OPS, and SIG regarding each office's search:

        a.    Refugee, Asylum, & International Operations Directorate: selected multiple employees within the Directorate to conduct a search of their records. Each person that was asked to conduct a search was selected based on their job duties and involvement with the subject matter of Plaintiff's request. Collectively, these persons searched their Email, Archived Email, Enterprise Vault, Desktops, Work Folders, and Shared Drives with the terms "Maine," "Boston," "Fraud," "Training Fraud," "Fraud Training," "FDNS," "Credible," "Credibility," "Credibility Training," "Training Credibility," "Angola," "Burundi," "Democratic Republic of Congo," "DRC," "Rwanda," "Eliciting," "Trauma," "Vicarious Trauma," "Trauma Survivor," "Minor," "Bias," "Sensitivity," "Profiling," "Racial/Anti-racial Profiling," "Racial," "Survivors," "SPEG

(Speaking Engagements)," "Social Media," "SM Training," and "Guidance," and "Instructions to Adjudications."

b. Office of Performance and Quality: searched its GLOBAL database and extracted requested data elements from January 1, 2010 for Newark Asylum Field Office and from January 1, 2015 for Boston Asylum Field Office and produced one report for each of the Newark and Boston Asylum Offices. GLOBAL is USCIS's case management system for all Asylum Division case type data. When an asylum application is filed and as it continues through the process of interview and consideration, staff input certain data relating to the application into GLOBAL. In order to respond to the Plaintiff's FOIA request, the Office of Performance and Quality conducted a search of GLOBAL, and extracted data based on the following requested categories: the applicant's receipt number, the applicant's state, the asylum office, the applicant's country of birth, the applicant's age at filing, the applicant's gender, the applicant's ethnicity, the applicant's citizenship, the applicant's languages, the applicant's affirmative filing date, the applicant's affirmative interview date, the applicant's affirmative decision date, the applicant's affirmative decision, the applicant's attorney identifier, whether the applicant was represented by an attorney, the USCIS supervisor's first name, the USCIS supervisor's last name, the asylum officer's first name, the asylum officer's last name, the applicant's zip code, and the case outcome reason.

c. Office of Policy and Strategy: advised the USCIS FOIA Office that it had no records pertaining to either the Boston or Newark Asylum Offices,

because the Office of Policy and Strategy defers to RAIO when it comes to issuing instruction to specific asylum offices.

21.    While the majority of the Plaintiff's request sought policy documents, the request also sought records and statistical data relating to affirmative asylum cases arising out of the Newark Asylum Office from 2010 through present and the same for the Boston Asylum Office from 2015 through present. See Ex. A. at pp. 3-4.  USCIS tracks certain statistical data regarding affirmative asylum cases in its GLOBAL database and was able to search for and produce two Excel spreadsheets (one relating to cases from the Newark Asylum Office and one for cases from the Boston Asylum Office).  These two Excels contain over 100,000 rows, and include the extracted data described earlier in this declaration at Paragraph 20.b.

22.    The remainder of the information sought by Plaintiff pertaining to individual applicants could only be obtained by searching individual A-File records, which would require the agency to undertake a significantly burdensome search.  Specifically, while some data is maintained in electronic databases, as described above, the most complete and accurate accounting of an individual's immigration history, including information related to an applicant's eligibility for an immigration benefit, resides in the A-file.  While there have been recent efforts to digitize some of the forms in A-Files, the records are still mostly paper-based.  Additionally, those files that are digitized are maintained in an electronic PDF form that still requires a page by page review, as USCIS does not have the capability to electronic search digitized files and export the data electronically without manually reviewing the file. While the majority of A-Files are stored at the NRC, A-Files might also be located at one of the hundreds of field offices around the country.  For example, even if an application is under the jurisdiction of the Newark or Boston Asylum Offices, it is not necessarily maintained within those offices, and may be located elsewhere depending on the status of the application.  In order to determine the location of a file,

13

USCIS FOIA staff use biographical information pertaining to an individual, such as name, date

of birth, A-Number, or other identifying information to run a computerized database search in

USCIS's databases RAILS, Central Index System 2 (CIS2), and Person Centric Query Service

(PCQS) to locate the file pertaining to the individual and to determine the file's location.  There

is no way to run a report to determine the location for all files pertaining to individuals that have

had affirmative asylum applications processed by the Newark Asylum Office or by the Boston

Asylum Office without conducting multiple manual searches.  Further, after locating and

obtaining the file and to process a FOIA request for an A-File,  USCIS must then digitize its

contents using a high-speed scanner before the documents can be reviewed.  Accordingly, an

electronic search of these files is not possible, and any search would require a manual review of

each paper A-file, resulting in an extremely slow and burdensome process.

     23.     In order to obtain this information from the relevant paper files, USCIS would

need to obtain and manually review the paper A-files for "case file information and [r]ecords for

each affirmative asylum application processed by the Newark Asylum Office from January 1,

2010 to present and by the Boston Asylum Office from January 1, 2015 to present."  <u>See</u> Exhibit

A (July 12, 2019 FOIA Request).  This would encompass approximately 156,293 A-files, and the

111,852 receipts for immigration filings associated with them.  The administrative, financial, and

logistical burdens of obtaining these files from their locations in the field to the FOIA Office for

processing would be significant: USCIS would need to devote multiple personnel to oversee the

retrieval process, pay for certified shipping, and develop a systematic training regimen to guide

personnel participating in the review.  Specifically, in order to obtain each file, it would require

approximately 78,146.50 hours to search for, locate, and request each file.  Further, once they

were obtained, USCIS estimates it would take at least one hour to review each A-file, correlate it

with the relevant databases, and record the results, equaling approximately 156,293 hours.    In

order to conduct this search, the USCIS FOIA office would need to dedicate 123 personnel working every day for a year (assuming a 40-hour workweek with 10 paid holidays, 2 weeks of vacation, and no sick time) to complete this task. As such, the cost and time involved in such a search would be overly burdensome for the agency.

24.    After receiving records from the assigned offices, the SIG team reviewed all documents to determine whether the search was reasonably calculated to locate records responsive to Plaintiff's FOIA request.  Based upon the SIG team's review of the Plaintiff's FOIA request and its particular subject matter, along with the responsive records received, the agency determined that it had identified all of the appropriate Directorates and program offices within USCIS, and each office had received all of the information needed to perform a search that was reasonably calculated to locate any records responsive to this request.  Additionally, after reviewing the responses from each office, the USCIS FOIA office determined that staff within the offices searched all files that were reasonably likely to contain records responsive to the Plaintiff's FOIA request.  Based on the SIG team's review of this information, it determined that the search was adequate, and that it was unlikely that any of the other USCIS Directorates or program offices would have records responsive to this request.

## USCIS'S PROCESSING OF RECORDS RESPONSIVE TO PLAINTIFF'S FOIA REQUEST

25.    As part of the agency's rolling production during the course of discovery in this litigation, USCIS made productions on the following dates:

  a.    On January 29, 2021, USCIS released 623 pages to the requester.

  b.    On February 26, 2021, USCIS released 832 pages to the requester.

  c.    On March 31, 2021, USCIS released 1,608 pages to the requester.

  d.    On April 30, 2021, USCIS released 1,741 pages to the requester.

  e.    On May 28, 2021, USCIS released 1,317 pages to the requester.

f.   On June 17, 2021, USCIS released 16 pages to the requester following a consultation with Immigration and Customs Enforcement.

g.   On July 29, 2021, USCIS released 7 pages following a consultation with Customs and Border Protection, and 59 pages following a consultation with the Department of Homeland Security.  USCIS also released 2 Excel spreadsheets containing statistical data.

h.   In total, USCIS produced 6,121 pages in response to Plaintiff's request in rolling productions.  Of these 6,121 pages, 3,840 pages were released in their entirety.  USCIS withheld 2,273 pages in part and 8 pages in full, pursuant to 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C) and (b)(7)(E) of the FOIA.

i.   On July 29, 2021, USCIS released certain budget documents, further detailed later in this declaration, that were required by Plaintiff.

j.   On October 13, 2021, USCIS released 74 pages consisting of the "Employee Performance Plan and Appraisal Form."  USCIS also released 2 updated Excel spreadsheets containing statistical data.

k.   On October 21, 2021, USCIS released certain previously withheld pages, further detailed later in this declaration.

l.   On November 16, 2021, USCIS further released certain previously withheld pages, further detailed in this declaration.

See Exhibit C (Rolling Production Cover Letters).

26.   Further, the agency's rolling production cover letters included the following descriptions of the applicable FOIA exemptions:

Exemption (b)(5) provides protection for inter-agency or intra-agency

memorandums or letters, which would not be available by law to a party other than an agency in litigation with the agency.  The types of documents and/or information that we have withheld under this exemption may consist of documents containing pre-decisional information, documents or other memoranda prepared in contemplation of litigation, or confidential communications between attorney and client.

Exemption (b)(6) permits the government to withhold all information about individuals in personnel, medical and similar files where the disclosure of  such information would constitute a clearly unwarranted invasion of personal privacy. The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, drivers' licenses, social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal.

Exemption (b)(7)(C) provides protection for personal information in law enforcement records, which could reasonably be expected to constitute an unwarranted invasion of personal privacy. We have withheld information relating to third-party individuals. The types of documents and/or information that we have withheld could consist of names, addresses, identification numbers, telephone numbers, fax numbers, or various other documents that are considered personal.

Exemption (b)(7)(E) of the FOIA provides protection for records or information for law enforcement purposes which would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law. The types of documents and/or information we have withheld could consist of law enforcement systems checks, manuals, checkpoint locations, surveillance techniques, and various other documents.

**THE PARTIES' NEGOTIATIONS FOLLOWING USCIS'S PROCESSING OF RECORDS RESPONSIVE TO PLAINTIFF'S FOIA REQUEST**

27.      After reviewing these productions, Plaintiff advised Defendant that it had identified numerous documents that Plaintiff believed contained disputed redactions.  Plaintiff also advised that it believed that the agency had allegedly failed to search for and produce a document titled the "Employee Performance Plan and Appraisal Form."  Plaintiff requested that if the agency would produce certain budget documents for the years 2015 through 2021, Plaintiff would agree to narrow the scope of its disputed reactions.  These budget documents were not requested in Plaintiff's request.  Nevertheless, in an effort to compromise and narrow the disputed issues, the agency agreed to produce all the requested budget documents.  The agency searched for and shared the requested budget documents on July 29, 2021.

28.      On August 3, 2021, Plaintiff advised Defendant that it had determined to narrow the disputed redactions. Specifically, Plaintiff's contested documents consisted of 343 pages, which were sorted by two document types: emails and other, and training materials.[3]

29.      On August 3, 2021, Plaintiff also requested that if Defendant would produce certain additional columns relating to the statistical data Defendant had previously provided, Plaintiff would agree to not challenge Defendant's alleged failure to search for and produce denials, referral notices, administrative closures, and grants of asylum applications processed by

---

[3] The full list of contested pages outlined as of August 3, 2021, were as follows: 3699-3704, 3707, 3709-3710, 3713-3715, 3719, 3724-3730, 3734-3736, 3760, 3762-3765, 3842-3844, 3871, 3879-3881, 3883-3884, 3940-3945, 3988-3989, 3993-3994, 4004-4006, 4095, 4097-4113, 4116, 4121-4130, 4132-4135, 4137-4141, 4194-4195, 4257, 4258, 4259-4261, 4266-4271, 4295, 4303, 4309, 4314, 4319, 4669, 4677-4687, 4929, 4931-4947, 5308-5310, 5481-5482, 5490, 5605-5607, 5611, 5653, 5664, 5697, 5707-5712, 5714-5715, 5717-5719, 5866-5928, 5936-6025, 6051-6078, 6103-6104.

the Newark Asylum Office and the Boston Asylum Office from 2015 to the present. Specifically, Plaintiff requested additional columns that would reflect the supervisor's name, asylum officer's name, the zip code of the applicant, and the reason for the decision or referral. These additional columns were not requested in Plaintiff's request.  Nevertheless, in an effort to further compromise and narrow the disputed issues, the agency re-reviewed the statistical data that is tracked regarding affirmative asylum cases and updated the previously provided two Excel documents to include these newly requested columns.

30.    The agency produced to Plaintiff the two updated Excels on October 13, 2021. The two updated Excels, which contain tens of thousands of rows of data as discussed earlier in this declaration, now contain 21 columns of tracked statistical data.  The information provided to Plaintiff regarding the reason for the decision or referral is the highest level of detail regarding a case's outcome that the agency maintains in its GLOBAL database and extracted requested data elements.  On the same day, October 13, 2021, the agency also produced to Plaintiff 74 pages consisting of the "Employee Performance Plan and Appraisal Form."

31.    Though Defendant has shared this additional data with Plaintiff, Plaintiff has represented that it is continuing to contest the agency's failure to search for and produce referrals or denials for asylum applications processed by the Newark Asylum Office and the Boston Asylum Office where the basis for the referral or denial is "ineligibility."  That information sought by Plaintiff is not tracked in the agency's GLOBAL database, or any other database maintained by the agency.  As described earlier in this declaration, there is no reasonably practical method of searching for the referrals and denials sought by Plaintiff apart from a manual search of individual A-File records.  A manual search of individual A-Files would require the agency to undertake a significantly burdensome search.  To obtain the referrals and denials sought by Plaintiff would require the manual collection and search of approximately

19

14,488 individual A-Files.  In order to obtain each file, it would require approximately 7,244 hours to search for, locate, and request each file.  Further, once they were obtained, USCIS estimates it would take at least one hour to review each A-file, correlate it with the relevant databases, and record the results, equaling approximately 14,488 hours.   In order to conduct this search, the USCIS FOIA office would need to dedicate 11 people working every day for a year (assuming a 40-hour workweek with 10 paid holidays, 2 weeks of vacation, and no sick time) to complete this task. As such, the cost and time involved in such a search would be overly burdensome for the agency.

32.     Additionally, as a result of the parties' good faith negotiation and for the purposes of potentially further narrowing the contested documents in this litigation, the agency voluntarily conducted another review of Plaintiff's contested pages, and exercised its discretion to release certain information to Plaintiff without conceding that any of Plaintiff's disputed redactions have merit. Specifically, on October 21, 2021, USCIS released additional portions of information within the 343 contested pages. Following this release, the parties further conferred, and Plaintiff further narrowed the scope of its contested pages, reduced the total from 343 pages to 108 contested pages.  See Exhibit D (Nov. 1, 2021 Email from E. Bond to K. Saner).

33.     On November 2, 2021, Plaintiff's counsel advised USCIS that they had located two emails within the responsive records that appeared to indicate that USCIS had removed some of the information pertaining to specific individuals within documents that were used as part of USCIS's asylum officer training.  See Exhibit E (Nov. 2 Email from E. Bond to K. Saner). USCIS had previously withheld this information under Exemption (b)(6) in order to protect information pertaining to individual asylum applicants.  USCIS reached out to the individuals named in the emails, who confirmed that some of the information, where possible, had been removed and substituted to protect personal information pertaining to actual applicants.

The individuals then reviewed the records and identified the portions of the documents that contained artificial information that could be released.  USCIS reprocessed the 108 contested pages and provided a supplemental production to Plaintiff on November 16, 2021.  There is now a total of 84 contested pages remaining at issue, which have been withheld in part pursuant to 5 U.S.C. § 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E) of the FOIA.

34.    It has been determined that no further segregation of meaningful information in the withheld documents is possible without disclosing information that warrants protection under the law.  The only information withheld from Plaintiff is information that is entitled to protection from disclosure.

## USCIS'S VAUGHN INDEX FOR THE CONTESTED PAGES

35.    With regard to the information on the contested pages that was withheld from USCIS's response, attached to this declaration at **Exhibit F** is an index identifying and describing each document in which information was withheld, specifying the particular exemption under which the information was withheld, and explaining how the exemption applies to the information that was withheld.  Information regarding how non-exempt information was segregated from exempt information is included in the index. I am familiar with the records described in the Vaughn index.  The index accurately describes those records, and explains USCIS's proper assertion of the appropriate FOIA exemptions.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Executed in Lee's Summit, Missouri, on this 17th day of November 2021.

_____
ELLIOT VIKER
Acting FOIA Officer
Freedom of Information Act & Privacy Act Unit
USCIS National Records Center