UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION, | ) ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )      2:20-cv-00422-JAW |
| | ) |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | ) ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Plaintiff seeks disclosure of certain records concerning asylum applications processed by two of Defendant's regional offices.  (Complaint, ECF No. 1.)  The parties filed cross motions for summary judgment.  (Motions, ECF Nos. 32, 35.)

Following a review of the summary judgment record and the parties' arguments, I order Defendant to submit certain documents for in camera review, and I recommend the Court grant partial summary judgment in favor of Plaintiff as to some of the documents; and (2) grant partial summary judgment in favor of Defendant regarding other documents.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with

respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* at 78 ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

"Summary judgment is the typical and appropriate vehicle to resolve" most FOIA cases. *Gellman v. Dep't of Homeland Sec.*, 525 F. Supp. 3d 1, 6 (D.D.C. 2021); *see also*, *Gray v. Sw. Airlines Inc.*, 33 F. App'x 865, 869 n.1 (9th Cir. 2002) ("in FOIA cases there is rarely any factual dispute at all, but only a legal dispute over how the law is to be applied to the documents at issue"). An agency can generally carry its burden by means of "[a]ffidavits or declarations giving reasonably detailed explanations why any withheld documents fall within an exemption . . . ." *ACLU v. Dep't of Just.*, 681 F.3d 61, 69 (2d Cir. 2012).

If an agency's explanations are inadequate to permit a court to determine whether the agency satisfied the requirements of the FOIA, the court may "direct the government

to revise its submissions," *Church of Scientology Int'l v. U.S. Dep't of Just.*, 30 F.3d 224, 239 (1st Cir. 1994), or conduct an in camera review to "determine whether the failure of the affidavit stemmed from mere inadvertence or from a truly overbroad reading of the exemption by the agency." *Irons v. Bell*, 596 F.2d 468, 472 (1st Cir. 1979). While in camera inspection should not be used as "a substitute for the government's burden of proof, and should not be resorted to lightly," *Lane v. Dep't of Interior*, 523 F.3d 1128, 1136 (9th Cir. 2008), and while it might be "unreasonable to expect a trial judge" to independently characterize hundreds or thousands of pages, "*in camera* review is particularly appropriate when the documents withheld are brief and limited in number." *Maynard v. C.I.A.*, 986 F.2d 547, 558 (1st Cir. 1993).

## SUMMARY JUDGMENT RECORD

### A.      Dr. Zeno's Asylum Application and FOIA Request

Dr. Basileus Zeno, a native of Syria who is now a college professor, came to the United States in 2012 and filed an application for asylum with Defendant's Boston office in 2013. (Plaintiff's Statement of Material Facts ¶¶ 6, 10–11, ECF No. 37 (hereinafter PSMF); (Plaintiff's Statement of Additional Material Facts ¶¶ 1, 5, ECF No. 38 at 17 (hereinafter PSAMF).) Dr. Zeno had engaged in political advocacy and criticized the dominant Syrian regime, which activity included the publication of critical essays and participation in protests. (PSMF ¶ 7.) After Dr. Zeon filed a threat of a writ of mandamus in November 2020 due to the lack of a decision over many years, and after multiple interviews at the Boston office, Defendant sent Dr. Zeno a Notice of Intent to Deny his

application in February 2021 and a final denial notice in May 2021. (Affidavit of Basileus Zeno ¶¶ 19–26, ECF No. 37-1; PSAMF ¶ 7.)

Dr. Zeno believed that the officers conducting the interviews were adversarial and attempted to fit his personal situation into inapplicable scenarios. (Zeno Affidavit ¶¶ 19–20, 22, 27.) He also asserts that the final decision misconstrued the law, contradicted itself, relied too much on selective Country Conditions reports, and misunderstood how the situation in Syria had changed since 2011. (*Id.* ¶¶ 27–30.) Because he questioned the bases for the decisions of the Boston office, and because he believed the process lacked transparency and responsiveness, Dr. Zeno filed a FOIA request; when he received responsive documents, most of the information on the documents was redacted. (*Id.* ¶¶ 32–33.) In December 2021, Defendant sent Dr. Zeno a letter reopening his asylum application. (*Id.* ¶ 36.)

## B.     Plaintiff's FOIA Request and Lawsuit

In 2019, Plaintiff became concerned about the asylum approval rate of Defendant's Boston office. (PSMF ¶ 1.) According to Plaintiff's calculations based on Defendant's summary reports of asylum cases, the national average for affirmative asylum approvals is around thirty percent, while the rate for the Boston office has been as low as approximately eight percent. (*Id.* ¶ 2.)[1]

---

[1] Plaintiff supported some of its statements by citing Defendant's 2019 quarterly reports published on Defendant's website. Defendant denied some of the statements as unsupported by a more specific citation. The information is derived from Defendant's documents, and the reports include tables that contain the number of total cases and cases approved and denied for each regional office. The approval rate, therefore, appears to be a straightforward calculation for which Defendant does not assert any error. *See, e.g.*, *Affirmative Asylum Statistics February 2019* at 5, U.S. Citizenship and Immigration Services, https://www.uscis.gov/sites/default/files/document/data/PED_AffirmativeAsylumStatisticsFeb2

On July 12, 2019, Plaintiff submitted a FOIA request to Defendant; Defendant acknowledged receipt on August 14, 2019, and assigned case number COW2019500947 to the request.  (Defendant's Statement of Material Facts ¶¶ 6, 8, ECF No. 31 (hereinafter DSMF); PSMF ¶ 14.)   Plaintiff sought "all records and documentation" related to "approvals, referrals, and denials of affirmative asylum cases" arising out of the Boston and Newark offices.  (DSMF ¶ 7; PSMF ¶¶ 15–16.)   The request covered four sub-categories of documents (some of which included additional sub-sub-categories) under the heading "Records regarding Data & Statistical Information of Affirmative Asylum Cases as handled by the Boston and Newark Asylum Offices."  (DSMF ¶ 7; PSMF ¶ 16.)   The request also sought eight sub-categories of documents (some which included additional sub-sub-categories) under the heading "Records Related to the Policies, Procedures, and Objectives of the Boston and Newark Asylum Offices Regarding Affirmative Asylum Cases" with an apparent focus on records relating to applicants from Angola, Burundi, the Democratic Republic of Congo, and Rwanda.  (DSMF ¶ 7; PSMF ¶ 16.)

For more than a year following the July 12, 2019, FOIA request, Defendant's sole response was the August 14, 2019, acknowledgement of receipt of the request.  (PSMF ¶ 17.)  On November 11, 2020, Plaintiff filed this lawsuit asserting: (1) a violation of FOIA

---

019.pdf.  In accordance with the District of Maine Local Rule, Plaintiff could have submitted the reports and included its own summary table illustrating the calculations it made, which would have allowed Defendant to make more specific admissions or denials.  Nevertheless, the accuracy of the calculations does not appear to be relevant to the parties' FOIA dispute and need not be resolved here.  The statements appear to serve only as an estimate offered for a limited purpose: to explain Plaintiff's and the public's interest in disclosure of the disputed FOIA documents at issue in this lawsuit.  In this context and for that limited purpose, the Court can consider the statements at summary judgment.

for failure to determine whether it would comply with the request within twenty days, and (2) a violation of FOIA for failing to make the records promptly available upon request. (Complaint at 8–9, ECF No. 1; PSMF ¶ 18; DSMF ¶¶ 21–22.)  In early 2021, the parties agreed that Defendant would produce a certain number of responsive documents each month.  (PSMF ¶ 19–20; Joint Status Report, ECF No. 13.)

## C.   Search Process

Defendant processes FOIA requests according to the United States Department of Homeland Security implementing regulations found at 6 C.F.R. Part 5 and Management Directive No. 0460.1.  (DSMF ¶ 1.)  In recent years, Defendant has experienced a significant increase in the number of FOIA requests it receives.  (*Id.* ¶ 2.)  For example, during Fiscal Year 2016, USCIS received 166,732 FOIA requests, and that number increased to 195,731 in Fiscal Year 2020, which represented more than twenty-five percent of the total FOIA requests the federal government received.  (*Id.*)

Upon receipt of a non-alien file records request, the Significant Interest Group team within Defendant's National Records Center reviews the request, determines its precise nature and scope, identifies all agency offices that may have potentially responsive records, and forwards the request to the offices for a search and response.  (*Id.* ¶¶ 3–5.)  In addition to searching its own records, the offices are generally asked to identify any other agency offices that it believes could have potentially responsive records.  (*Id.* ¶ 5.)

For Plaintiff's request, which focused primarily on policies and procedures relating to affirmative asylum cases arising out of the Boston and Newark offices, the Significant Interest Group team determined that the offices most likely to maintain responsive

documents were: (1) Defendant's Refugee, Asylum, & International Operations Directorate; (2) Defendant's Office of Performance and Quality; and (3) Defendant's Office of Policy and Strategy.  (*Id.* ¶¶ 10–12.)  The Significant Interest Group team provided a copy of the request to each of the three offices, requested their staff use any search terms or phrases reasonably calculated to locate responsive records, and identify any additional offices which might have responsive records.  (*Id.* ¶ 13.) No other offices were identified.  (*Id.*)

Multiple employees within the Refugee, Asylum, & International Operations Directorate searched their emails, archived emails, Enterprise Vault, desktops, work folders, and shared drives with the terms: "Maine," "Boston," "Fraud," "Training Fraud," "Fraud Training," "FDNS," "Credible," "Credibility," "Credibility Training," "Training Credibility," "Angola," "Burundi," "Democratic Republic of Congo," "DRC," "Rwanda," "Eliciting," "Trauma," "Vicarious Trauma," "Trauma Survivor," "Minor," "Bias," "Sensitivity," "Profiling," "Racial/Anti-racial Profiling," "Racial," "Survivors," "SPEG (Speaking Engagements)," "Social Media," "SM Training," and "Guidance," and "Instructions to Adjudications."  (*Id.* ¶ 14.)

The Office of Performance Quality searched its Global database and extracted requested data elements for information about the Newark Asylum Office and Boston Asylum Office for the requested time period.  (*Id.* ¶ 15.)  Global is Defendant's case management system for all Asylum Division case type data.  (*Id.*)  When an asylum application is filed and as it continues through the process of interview and consideration, staff input into Global certain data relating to the application.  (*Id.*)

The Office of Policy and Strategy determined that it did not have any responsive records because it defers to the Refugee, Asylum, & International Operations Directorate when issuing instruction to the regional asylum offices.  (*Id.* ¶ 16.)

## D.    Disclosures

In accordance with the parties' production agreement, between January 29, 2021 and November 16, 2021, Defendant produced a total of 6,121 pages of documents and two spreadsheets of data.  (PSMF ¶ 21; DSMF ¶ 24–25.)[2]  3,840 of the pages were released in their entirety, 2,273 pages contained partial redactions, and eight pages were completely redacted.  (PSMF ¶ 22.)

After Defendant completed its initial round of production in June 2021 (i.e., six productions), the parties met to discuss several redactions which Plaintiff believed to be erroneous.  (PSMF ¶ 24; DSMF ¶ 26.)  During the discussions, Plaintiff also asserted that Defendant had failed to produce a document titled "Employee Performance Plan and Appraisal Form" and requested that certain budget documents for the years 2015 through 2021 be disclosed, in consideration for narrowing the scope of the disputed redactions. (PSMF ¶¶ 25–26; DSMF ¶ 26.)

---

[2] Defendant released: 623 pages on January 29, 2021; 832 pages on February 26, 2021; 1,608 pages on March 31, 2021; 1,741 pages on April 30, 2021; 1,317 pages on May 28, 2021; 16 pages on June 17, 2021 following a consultation with Immigration and Customs Enforcement; 2 spreadsheets containing statistical data and budget documents and 7 pages on July 29, 2021 following a consultation with Customs and Border Protection, and 59 pages following a consultation with the Department of Homeland Security; 74 pages and two updated spreadsheets on October 13, 2021; and certain previously withheld pages on October 21, 2021 and November 16, 2021.  (DSMF ¶ 24.)  Several of the later releases are discussed in further detail below.

In July 2021, Defendant produced the budget documents and two spreadsheets of data which together contain more than 100,000 rows and columns reflecting the applicant's receipt number, the applicant's state, the asylum office, the applicant's country of birth, the applicant's age at filing, the applicant's gender, the applicant's ethnicity, the applicant's citizenship, the applicant's languages, the applicant's affirmative filing date, the applicant's affirmative interview date, the applicant's affirmative decision date, the applicant's affirmative decision, the applicant's attorney identifier, and whether the applicant was represented by an attorney.  (PSMF ¶¶ 27; DSMF ¶¶ 17, 26, 31.)

Plaintiff notified Defendant of its narrowing of the disputed redactions in August 2021; the contested redactions were then limited to 343 pages.  (PSMF ¶ 28; DSMF ¶ 27.) Plaintiff also asked Defendant to produce additional columns of the statistical data Defendant had previously provided, which request was not explicitly included in Plaintiff's original FOIA request because prior to Defendant's disclosures, Plaintiff was not aware the data existed.  (PSMF ¶ 30; DSMF ¶ 31.)  In consideration for the additional columns of data, Plaintiff agreed to modify its original request for denials, referral notices, administrative closures, and grants of asylum applications handled by the Boston and Newark offices, to request referrals and denials only.  (PSMF ¶ 31; DSMF ¶ 31.)

Defendant reviewed again the 343 remaining pages and produced certain previously redacted information in October 2021.  (PSMF ¶ 29; DSMF ¶ 28.)  Defendant also produced the Employee Performance Plan and Appraisal Form and an additional spreadsheet of data consisting of columns corresponding to the asylum officer's supervisor's first name, the asylum officer's supervisor's last name, the asylum officer's

9

first name, the asylum officer's last name, the applicant's zip code, and the case outcome reason.  (PSMF ¶ 32; DSMF ¶ 31.)  The remaining disputed redactions covered 108 pages. (PSMF ¶ 33; DSMF ¶ 29.)

Plaintiff notified Defendant that two emails appeared to have been improperly redacted—it appeared that certain information related to specific individuals had been redacted to protect the identities of asylum applicants, but Plaintiff understood that the protected information had been altered for training purposes and would not implicate any real applicant.  (PSMF ¶ 34; DSMF ¶ 29.)  Defendant reviewed the contested 108 pages further and produced additional information in November 2021, leaving 84 pages with redactions in dispute.  (PSMF ¶¶ 35–36; DSMF ¶ 29–30.)

Defendant prepared a *Vaughn* Index,[3] (ECF No. 30-6), which identified and described each disputed document, specified the particular FOIA exemption under which Defendant withheld portions of the document, and explained the bases of Defendant's belief that the asserted FOIA exemption applied to the withheld information.  (DSMF ¶ 34.)

## E.    Referral Notices, Notices of Intent to Deny, and Denial Notices

If an asylum officer determines that an asylum applicant who is not in lawful valid status or parole is not eligible for asylum, the asylum officer refers the applicant's asylum case to the administrative immigration court within the Executive Office for Immigration Review, together with the appropriate charging document, for de novo adjudication.

---

[3] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

(Defendant's Statement of Additional Material Facts ¶ 3, ECF No. 46 at 11–14 (hereinafter

DSAMF).)  The applicant is notified via a referral notice.  (DSAMF ¶ 3.)  "Referral notices

contain personal identifying information about asylum applicants, including the applicant's

name, address, and the "A-number."  (*Id.* ¶ 5.)

Referral notices are generated by asylum officers using the Service Documents card

in Global.  (*Id.* ¶ 4.)  To prepare a referral notice, an asylum officer selects the applicable

referral notice from a drop-down menu.  (*Id.*)  After selecting the type of referral, asylum

officers are provided standard paragraphs from which to select the reason(s) for referral,

which differ depending on the reasons for the asylum ineligibility.  (*Id.*)  Depending on the

reason for the ineligibility, an asylum officer may supplement the standard paragraph with

a brief, additional explanation.  (*Id.*)

Referral notices do not create or modify agency policy or practice, announce new

interpretations of law, or establish agency policy.  (*Id.* ¶ 6.)  Asylum officers may not rely

upon or cite referral notices as legal authority in other decisions.  (*Id.*)  Accordingly, referral

notices do not have any precedential effect.  (*Id.*)  Instead, asylum officers are instructed

to rely on decisions by the Board of Immigration Appeals, the Attorney General, and the

federal courts, among other sources, when determining an applicant's asylum eligibility.

(*Id.*)  The administrative immigration court evaluates the applicant's claim independently

and does not rely on the decision of the asylum officer.  (*Id.* ¶ 7.)  When Defendant refers

an asylum application to the immigration court, Defendant includes the charging document,

the complete asylum application, and any other documentary evidence submitted by the

applicant; Defendant does not include a copy of the referral notice that it sent to the

applicant.  (*Id.*)  If the immigration court denies the applicant's asylum application, an asylum applicant may appeal from the immigration court's decision to the Board of Immigration Appeals and subsequently to the federal circuit courts and the Supreme Court. (*Id.* ¶ 8.)

If an asylum officer determines that the applicant has lawful immigration status or parole in the United States and is found ineligible for asylum, Defendant sends the applicant a notice of intent to deny (NOID).  (*Id.* ¶ 9.)  The NOID states the reason(s) the applicant is ineligible for asylum and explains that the applicant has sixteen days to explain in writing either why the application should be granted or submit new evidence to support the asylum claim.  (*Id.*)  If the applicant does not respond to the NOID within sixteen days, or if the newly provided information failed to overcome the reasons for denial stated in the notice, Defendant sends an applicant a denial notice.  (*Id.* ¶ 10.)

Denial notices are generated by asylum officers using Global.  (*Id.* ¶ 11.)  To prepare a denial notice, an asylum officer selects the applicable notice from a drop-down menu. (*Id.*)  If the applicant provided a response to the NOID, the asylum officer selects the corresponding notice from the drop-down menu.  (*Id.*)  The asylum officer is prompted to add the reason(s) the applicant's NOID response failed to overcome the grounds for denial as stated in the NOID.  (*Id.*)  If the applicant did not provide a response to the NOID, the asylum officer selects the corresponding notice from the drop-down menu.  (*Id.*)  The asylum officer has no discretion to add additional information to the automatically generated form template final denial notice.  (*Id.*)  Denial notices contain personal

identifying information about asylum applicants, including the applicant's name, address, and A-number.  (*Id.* ¶ 12.)

An applicant who has received a denial notice may file a motion to reopen and/or a motion to reconsider within a certain amount of time.  (*Id.* ¶ 14.)  A motion to reopen must state new facts and must be supported by affidavits or other documentary evidence.  (*Id.*)  A motion to reconsider must be based on a misapplication of law or policy and must be supported by pertinent precedent case law.  (*Id.*)  Additionally, an asylum applicant who has received a denial notice may again apply for asylum affirmatively after receipt of the denial notice provided he or she is not under the jurisdiction of the immigration court and is in the United States.  (*Id.* ¶ 15.)

Denial notices do not create or modify Defendant's policy or practice.  (*Id.* ¶ 13.) Denial notices do not announce new interpretations of law or establish agency policy.  (*Id.*) Asylum officers may not rely upon or cite to denial notices as legal authority in other decisions and are not relied upon when addressing other applicants' cases.  (*Id.*) Accordingly, denial notices do not have any precedential effect.  (*Id.*)

## F.    **Burden of Searching Files for Notices**

Other than the eighty-four disputed pages of responsive documents, the remainder of the information Plaintiff requested regarding individual applicants could only be obtained by searching individual "A-File" records, which contain the most complete and accurate accounting of an individual's immigration history and eligibility for an immigration benefit.  (DSMF ¶ 18.)  While most A-Files are centrally located at the National Records Center, some A-Files might be located at one of the hundreds of field

offices throughout the country because even if an application falls under the jurisdiction of the Boston or Newark offices, it is not necessarily maintained within the Boston and Newark offices. (*Id.*)[4] Defendant cannot run a report to locate all A-Files regarding individuals processed by the Boston or Newark offices; Defendant would have to run individual searches of its databases using biographical information for each individual to determine the location of that individual's A-File. (*Id.*)

While there have been recent efforts to digitize some of the A-Files, the records are still mostly in paper form. (*Id.*) The A-Files that have been digitized are stored only in an electronic PDF format. (*Id.*) Defendant asserts that to produce all the information Plaintiff requested regarding the A-Files, Defendant would have to digitize the contents of the A-Files using a high-speed scanner and also manually review the documents. (*Id.*)[5] Because the full request encompasses approximately 156,000 A-Files, Defendant estimates that it would take 78,000 person-hours to search for, locate, and request each file, and an additional 156,000 person-hours to review each A-File, correlate it with the relevant databases, and record the results. (*Id.* ¶ 19.) That amount of work would require 123 individuals working full time for a year. (*Id.*)

---

[4] As examples of the wide variety of processes and possible locations, if a file required a background check, it would be routed to another of Defendant's offices that handles the specific type of background check, or if the file were eligible for retirement, it could be sent to the National Archives and Records Administration's Federal Records Center for storage. (DSAMF ¶ 1.)

[5] Defendant uses the Freedom of Information Act Immigration Records System, which Defendant asserts requires it to scan and digitize paper files in order to allow a processor to review each page and apply the appropriate redactions. (DSAMF ¶ 2.) Plaintiff disputes whether the digitization process is necessary if an employee must still manually review the records to apply redactions.

The information provided to Plaintiff in the updated spreadsheets is the most detailed information Defendant maintains in its electronic databases regarding the reason for the result in a case. (*Id.* ¶ 32.) To the extent Plaintiff narrowed its requests for referral and denial notices within A-Files to the subset of cases where the basis for the referral or denial is "not eligible," Defendant would have to collect and search approximately 14,500 A-Files. (*Id.*) Defendant asserts that would take approximately 7,250 person-hours to locate and request the smaller subset of files, and approximately 14,500 hours to review each file, correlate it with the relevant databases, and record the results. This effort would require 11 people working full time for a year. (*Id.*)

## DISCUSSION

The Freedom of Information Act, 5 U.S.C. § 552, "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Environmental Protection Agency v. Mink*, 410 U.S. 73, 80 (1973). In addition to publishing certain information in the Federal Register, *id.* § 552(a)(1), and making other information available for public inspection in electronic format (referred to as an electronic reading room), *id.* § 552(a)(2), federal agencies generally must make records promptly available upon any request reasonably describing the records sought, *id.* § 552(a)(3), unless the records fall within a listed exemption. *Id.* § 552(b). The statute authorizes federal district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

"Because FOIA's purpose is to expose the operations of federal agencies to the light of public scrutiny, its exemptions are construed narrowly, with all doubts resolved in favor of disclosure." *Eil v. U.S. Drug Enforcement Admin.*, 878 F.3d 392, 397 (1st Cir. 2017) (quotation marks omitted). "[T]he government agency bears the burden of proving the applicability of a specific statutory exemption." *Union Leader Corp. v. Dep't of Homeland Sec.*, 749 F.3d 45, 50 (1st Cir. 2014).

## A.    Adequacy of Defendant's Search

"The adequacy of an agency's search for documents under the FOIA is judged by a standard of reasonableness and depends upon the facts of each case." *Maynard v. CIA*, 986 F.2d 547, 559 (1st Cir. 1993). "The crucial issue is not whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'" *Id.* (quoting *Safecard Servs., Inc. v. S.E.C.,* 926 F.2d 1197, 1201 (D.C. Cir.1991)). "[W]hen the request as drafted would require an agency to undertake an unreasonably burdensome search, the agency can decline to process the request." *Nat'l Security Couns. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020).

Plaintiff does not contest the adequacy of Defendant's search regarding its electronic databases, emails, and training records. Plaintiff contests Defendant's search decision regarding the A-File denial and referral notices. Plaintiff, however, has not challenged Defendants' assertion regarding the thousands of hours that would be required

16

to search, redact,[6] and disclose even the more limited number of notices in cases with a "not eligible" determination.  Rather, Plaintiff contends that: (1) Defendant overestimated the search burden because many, if not most, of the records might not be in other locations, and (2) Defendant overestimated the review-related burden because digitization might not be necessary if a manual search is required to redact the exempted information.  Even if the Court were to credit Plaintiff's argument and reduce significantly the 7,250 person-hours of search time and the 14,500 person-hours of review time for digitization measures, the burden would still be unreasonable.  Indeed, Plaintiff has not cited any cases where a district court ordered a search on the scale Defendant describes.[7]

Plaintiff also maintains the purported burden of producing the denial and referral notices is of Defendant's creation and, therefore, Defendant's argument should fail. Plaintiff argues the notices constitute "final opinions . . . made in the adjudication of cases," which Defendant is obligated to make available in its FOIA electronic reading room.  *See* 5 U.S.C. § 552(a)(2)(A).  Citing decisions in the Second and Ninth Circuits, Plaintiff

---

[6] Defendant argues that in addition to its ability to withhold certain information pursuant to FOIA exemptions, it is also required by statute and regulation to protect some information contained in the A-Files.  *See* 8 U.S.C. § 1367; 8 C.F.R. § 208.6.

[7] Plaintiff argues that a greater burden is acceptable when there is a high likelihood or a certainty of locating responsive records and most of the burden would be related to the redaction of the notices.  While courts have considered a greater burden to be tolerable when there is more than a mere chance that responsive records will be located, courts have refused to order excessively burdensome efforts even when there is a certainty that it would produce responsive records.  *See, e.g.*, *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1039 (7th Cir. 1998) (upholding a district court's refusal to order agency to undertake eight work-years of efforts to segregate non-exempt responsive material from exempt material); *Ayuda, Inc. v. Federal Trade Comm'n*, 70 F. Supp. 3d 247, 255, 261 (D.D.C. 2014) (8,000 person-hours of manual review labor to redact personally identifying information from large volume of responsive records would be unduly burdensome).

17

contends the Court has the authority under 5 U.S.C. § 552(a)(4)(B) to compel electronic disclosure of documents that agencies have improperly failed to publish to their electronic reading rooms, though courts have differed on that question. *See New York Legal Assistance Grp. v. Bd. of Immigration Appeals*, 987 F.3d 207, 215 (2d Cir. 2021); *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 877 (9th Cir. 2019).

In support of its contention that the denial and referral notices constitute final decisions, Plaintiff relies in part on two cases in which courts have concluded that denial and referral notices are postdecisional and final rather than predecisional for purposes of assessing the applicability of one of the exemptions - Exemption 5.[8] *See Abtew v. Dep't of Homeland Sec.*, 47 F. Supp. 3d 98, 106 (D.D.C.2014); *Gosen v. U.S. Citizenship and Immigration Serv.*, 118 F. Supp. 3d 232, 238–40 (D.D.C. 2015). Defendant contends the notices are not final opinions for purposes of § 552(a)(2)(A) because of their formulaic nature and the lack of any precedential value. Defendant argues Plaintiff has no standing to enforce the electronic reading room provisions.

First, contrary to Plaintiff's suggestion, while there may be some commonality between the Exemption 5 analysis and the electronic reading room analysis, the record lacks any evidence to suggest that Congress intended all postdecisional documents to be construed as "final opinions . . . made in the adjudication of cases" requiring automatic electronic publishing. Furthermore, as Defendant argues, Plaintiff has not pled a legal claim related to a violation of FOIA's electronic reading room provisions. Plaintiff did

---

[8] *See infra*, Part B.

18

not, in its complaint, allege that Plaintiff failed to publish electronically all denial and referral notices pursuant to § 552(a)(2).  Instead, Plaintiff alleged Defendant failed to make the requested documents promptly available after a request pursuant to § 552(a)(3).  If, as Plaintiff alleges, Defendant was required to publish the notices electronically, Plaintiff presumably was aware of the failure to publish at the time Plaintiff commenced this action.  Plaintiff cannot raise for the first time at summary judgment a claim that Defendant failed to satisfy another obligation under FOIA.  Plaintiff's argument that Defendant's alleged lack of compliance with 5 U.S.C. § 552(a)(2)(A) fails.

The record establishes that the denial and referral notices are in multiple locations and review of the requested documents would require thousands of person-hours to review.  Defendant, therefore, has demonstrated that its decision not to search the A-Files for the denial and referral notices was reasonable and that its search was otherwise adequate.

## B.    Exemption 5 Withholdings

Pursuant to Exemption 5, the FOIA disclosure obligations do not apply to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ."  5 U.S.C. § 552(b)(5).  "The Supreme Court has held that this exemption is coextensive with civil discovery privileges, including . . . the attorney-client privilege, the attorney work-product privilege, and the deliberative process privilege."  *Town of Winthrop v. FAA*, 328 F. App'x 1, 4–5 (1st Cir. 2009).  The only relevant privilege Defendant cited to support its withholdings was the deliberative process privilege.

"The deliberative process privilege shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021). "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quotation marks omitted). The government carries the burden of establishing . . . (1) that the withheld material is an inter- or intra- agency memorandum . . . (2) that the document is deliberative; and (3) that it is predecisional." *Stalcup v. CIA*, 768 F.3d 65, 70 (1st Cir. 2014).[9]

"A document will be considered 'predecisional' if the agency can (i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Providence Journal Co. v. Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992) (citations and quotation marks omitted). "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency,

---

[9] Congress has also provided a temporal limit. The privilege "shall not apply to records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). The time limit is not relevant here because all the documents Plaintiff sought were created within twenty-five years of its request.

and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."  *Id.* at 559 (quotation marks omitted).  "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *Fish & Wildlife Serv.*, 141 S. Ct. at 786.

Defendant withheld email communications generated in January 2020 between the Deputy Director of the Boston asylum office and two supervisory asylum officers in the Boston field office, which communications discuss the formation of a draft lesson plan that the asylum office was creating and multiple options to consider for the draft plan and reflect that the information would not have been included in the final version.  (*Vaughn* Index at 6–7.)  Defendant asserts that the email communications are privileged because they "relate[] to the development of internal training and template documents to advise Asylum Officers on how to handle situations where an applicant's testimony may be partially credible and partially not credible, which do not reflect the agency's final opinions or statements or policy" and because the higher level officers "are discussing how [Defendant]'s internal template should or should not be interpreted and communicated to Asylum Officers . . . ."  (*Id.*)  According to Defendant, "the emails include statements of uncertainty," "requests for additional information," and "optional courses of action and recommendations for the potential courses of actions being considered."  (*Id.*)

Defendant's reliance on Exemption 5 has merit.  In the *Vaughn* Index, Defendant identifies the interpretive decisions regarding training, and represents that the emails preceded and were prepared for the purpose of assisting officials making the decision regarding the interpretation process and to instruct other asylum officers.  Disclosure of the

emails would evidently not reveal the final agency decision—the interpretation ultimately made or the instructions ultimately given to subordinate asylum officers—but would instead reveal individual views during a consultative process, which views members of the public could inaccurately perceive as reflecting Defendant's ultimate decision.

Plaintiff argues that Defendant has inadequately explained how the emails, if disclosed, would cause embarrassment, or inhibit agency decision-making. While such concerns are part of the rationale for the rule, Plaintiff has provided no authority to suggest that Defendant must establish that the rationale for the rule justifies the withholding in each instance. The issue is whether a document constitutes a predecisional deliberative communication because in general the disclosure of that type of communication has been deemed to generate the risk of embarrassment, confusion, or inhibited decision making. By explaining that the email communications occurred before the final decision was made and that the communications consisted of interpretation and instruction, Defendant has demonstrated that the communications are predecisional and deliberative.

## C.    Exemption 6 Withholdings

Pursuant to Exemption 6, the FOIA disclosure obligations do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). When "evaluating whether a request for information is within the scope of a FOIA exemption, such as Exemption 6, that bars disclosure when it would amount to an invasion of privacy that is to some degree 'unwarranted', a court must balance the public interest in disclosure against the interest Congress intended the exemption to protect." *Dep't of Def. v. Fed.*

22

*Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (quotation marks omitted).  "[T]he only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government."  *Id.* at 495 (modifications and quotation marks omitted).  The Supreme Court explained:

> Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose.  That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.  In this case—and presumably in the typical case in which one private citizen is seeking information about another—the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records.  Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

*Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989).

Defendant redacted portions of an asylum officer training quiz titled "Credibility Issues Within Affirmative Asylum Issues," a training "Draft Fact Pattern for Eliciting Testimony," an "Eliciting Testimony" training, several email messages about Terrorism-Related Grounds for Inadmissibility (TRIG) and credibility, and a "Credibility Training." (*Vaughn* Index at 2–5, 7–8, 20–21, 23–24, 37.)  The redactions included an email address, phone number, applicant names, citizenship information, country of origin, addresses, political affiliation and roles in political elections, names of relatives, addresses of relatives, school addresses, dates of significance related to important events within the applicant's personal history, religious affiliation, specific churches attended, and other specific family and/or personal history information.  (*Id.*)

The parties do not dispute that information Defendant possesses about an individual asylum applicant's identity and personal history is within the definition of "similar files" under the statute. *See also*, *Phillips v. Immigration & Customs Enforcement*, 385 F. Supp. 2d 296, 304 (S.D.N.Y. 2005) ("Attachments to an individual's asylum request consisting of personal history data and supporting affidavits relating to the subject surely fall within this definition"); 8 U.S.C. § 1367(a)(2) (prohibiting disclosure of any information related to an alien who is the beneficiary of an application for relief until the application is denied and opportunities to appeal have been exhausted); 8 C.F.R. § 208.6 (Department of Justice regulation directing asylum and refugee records be generally treated confidentially).

There also appears to be no dispute that to the extent the training materials contain actual information about private individuals, given the potential for action against asylum seekers, the privacy interests involved are significant.   The public interest in this information, however, is also strong.   Plaintiff does not assert an interest in discovering anything about the asylum applicants individually, but rather asserts an interest in understanding how the agency instructed its officers to consider what the agency believed were illustrative circumstances and relevant details when deciding whether to grant or deny asylum applications.  *See, e.g.*, *Carpenter v. Dep't of Justice*, 470 F.3d 434, 441 (1st Cir. 2006) ("To the extent . . . that any of the requested material would reveal how the government responded to informants and others who offer information, a public interest might be served").   Plaintiff's asserted interest in the information implicates the core purpose of FOIA.  The public would benefit by discerning how Defendant applies its rules and policies to certain facts.  The withheld material, therefore, could conceivably provide

insight as to how the agency assesses and processes applications. Plaintiff's interest in information about the individual asylum applicants, however, would be minimal.

The result of the balancing of the various interests differs depending on the nature of the information. The public interest is low and the potential harm resulting from disclosure high for applicant names, addresses, names of relatives, and addresses of relatives. The same is true for employee email addresses and phone numbers on communications about TRIG issues. Defendant's decision to redact such information pursuant to Exemption 6 was appropriate.

While the risk of potential harm from the disclosure of school addresses, dates of significance related to important events within the applicant's personal history, churches attended, and other family and/or personal history might be somewhat less, the risk of a violation of an individual's privacy rights outweighs any probative value to the public's ability to assess Defendant's process. Defendant has established that the redaction of the information is warranted.

The public interest is high and the ability of the public to identify an applicant relatively low for citizenship information, country of origin, political affiliation, roles in political elections, and religious affiliation. The information is highly probative of Defendant's process and implicates the core FOIA objectives. Disclosure of the information would not be likely to result in an unwarranted invasion of personal privacy for the individual applicants.

D.     **Exemption 7 Withholdings**

Pursuant to Exemption 7, the FOIA disclosure obligations do not apply to certain "records or information compiled for law enforcement purposes . . . ."  5 U.S.C. § 552(b)(7).  Defendant, under the Secretary of Homeland Security, plays a role in enforcing immigration and nationality statutes, *see, e.g.*, 8 U.S.C. § 1103, and courts regularly conclude that some USCIS documents are covered by Exemption 7.  *Gosen v. ICE*, 75 F. Supp. 3d 279, 289 (D.C. Cir. 2014); *see also*, *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014) (courts are more deferential to an agency's claimed law enforcement purpose for the withheld records when "the agency's principal function is law enforcement," and courts "will scrutinize with some skepticism the particular purpose claimed" if the agency has mixed law enforcement and administrative functions) (citing *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982) (internal quotation marks omitted).

1.     **Exemption 7(C)**

Exemption 7(C) authorizes the withholding of "records or information compiled for law enforcement purposes" to the extent that the production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "The statutory direction that the information not be released if the invasion of personal privacy could reasonably be expected to be unwarranted requires the courts to balance the competing interests in privacy and disclosure." *Nat'l Archives & Recs. Admin. v. Favish*,

541 U.S. 157, 172 (2004).[10]  "[W]hen a legitimate privacy interest is implicated, the party seeking disclosure must show (1) that there is a significant public interest in disclosure, and (2) that the requested information is likely to advance that interest."  *Eil v. U.S. Drug Enforcement Admin.*, 878 F.3d 392, 398 (1st Cir. 2017) (quotation marks omitted).

Defendant withheld "detailed information pertaining to an immigration applicant, including the applicant's case referral number, and the name of an immigration officer responsible for referring that application for additional vetting" from a screenshot of Defendant's Fraud Detection and National Security Data System database.  (*Vaughn* Index at 12–13.)  The screenshot was included in a training presentation for asylum officers called "FDNS Basics" developed by Defendant's Fraud Detection and National Security Directorate.  (*Id.*)  The presentation "reflects specific procedures, techniques, and guidelines that instruct Asylum Officers on the screening methods and background vetting that takes place during the adjudication of an asylum application, and FDNS's role in that process."  (*Id.*)

Plaintiff does not dispute Defendant's assertion of the law enforcement purpose of the training presentation, which assertion appears to be warranted based on the fraud detection and national security topics.  As with the analysis of Exemption 6, the

---

[10] While the interest balancing analysis of Exemptions 6 and 7(C) are functionally similar, the weight and burden assessments are different.  *See Dep't of Justice. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989) ("Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects"); *Favish*, 541 U.S. at 165–66 ("The adverb 'clearly,' found in Exemption 6, is not used in Exemption 7(C).  In addition, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion) (quotation marks omitted).

individuals' privacy interests are strong.  The public's interest in the names and personally identifying information does not appear to be significant. The insight the public would discern about the agency's process based on the identity of one applicant and one officer is not evident.  In addition, the record lacks any evidence that the screenshot depicts a representative fact pattern that served as a model for other adjudications, as opposed to merely an illustration of the FDNS database interface.

Plaintiff argues that the public's interest is more significant because it has shown that there is an issue regarding wrongfully screened or wrongfully denied applications. Courts have recognized that the public's interest in private information collected for law enforcement purposes could be significant when the information could shed light on government wrongdoing.  *See, e.g.*, *Moffat v. Dep't of Justice*, 716 F.3d 244, 252 (1st Cir. 2013) ("For example, to the extent that any of the requested material would reveal how the government responded to informants and others who offer information, or shed light on possible government misconduct, FOIA's purposes may be served") (modifications and quotation marks omitted).  The Supreme Court, however, has established that mere allegations of misconduct are insufficient:

> [W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Favish*, 541 U.S. at 174.

Plaintiff has alleged that the lower rates of asylum grants from Defendant's Boston office might be explained through a review of wrongfully denied applications and misapplications of the law, including in Dr. Zeno's case.  Defendant asserts the unknown applicant was not Dr. Zeno, which assertion Plaintiff does not dispute.  The public interest in government error or discrimination is clearly significant, but the record lacks evidence to suggest that public disclosure of the identity of a single applicant screened for fraud or national security purposes or a single officer's name would provide any meaningful insight into Defendant's process and practices.  In other words, Plaintiff has not produced any evidence that would warrant a reasonable belief that government impropriety occurred in the unknown applicant's case or by the officer who referred that application for screening. There is no basis to conclude that public disclosure of the individuals' identities would uncover wrongdoing.  Plaintiff's general suspicion based on overall grant/denial rates of Defendant's offices is insufficient to overcome the concrete privacy interests here.  *C.f. Union Leader Corp. v. Dep't of Homeland Sec.*, 749 F.3d 45, 56 (1st Cir. 2014) (ordering disclosure of redacted names of six specific alien arrestees because of attenuated privacy interests and because the lengthy delay between previous arrests and removal was circumstantial evidence suggesting reasonable possibility of government negligence). Defendant did not err when it withheld the personally identifying information.

### 2.    Exemption 7(E)

Exemption 7(E) authorizes the withholding of "records or information compiled for law enforcement purposes" to the extent that the production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose

guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The exemption generally sets a "low bar" for the agency, requiring only that it "demonstrate logically" how the disclosure creates a risk of circumvention of the law. *Widi v. McNeil*, No. 2:12-CV-00188-JAW, 2016 WL 4394724, at *28 (D. Me. Aug. 16, 2016) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011); *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).[11]

Defendant cited Exemption 7(E) for most of the disputed documents in this case, many of which documents reflected criteria or factors for detecting fraudulent asylum applications. The asserted risk of circumvention for most of the documents was that disclosure would put individuals on notice of what information Defendant considered for which purposes, allowing those individuals to withhold important information or selectively craft their responses to avoid the detection of fraud. For each category of documents and redactions, Plaintiff disputes whether disclosure would create a risk of circumvention of the law, but Plaintiff also argues that some of the disputed documents and redactions represent descriptions of conduct that Defendant considers or alleges to be a crime (i.e. fraud), rather than law enforcement techniques, procedures, or guidelines. (Plaintiff's Motion at 20.) In other words, Plaintiff acknowledges that Exemption 7(E) allows Defendant to withhold those secret "methods which allow [Defendant] to identify

---

[11] Courts are divided as to whether the "risk of circumvention" requirement applies only to guidelines, or whether it also applies to techniques and procedures. This Court has previously suggested the requirement applies to both clauses of the exemption, but it has not squarely addressed the question. *See ACLU of Maine Found. v. Dep't of Homeland Sec.*, 470 F. Supp. 3d 40, 46 n.2 (D. Me. 2020).

perpetrators of established crimes," but Plaintiff argues that Exemption 7(E) does not "allow an agency to create its own, incorrect definition of an offense (here, fraud), conceal it, and enforce it." (*Id.*)

A core congressional purpose of the FOIA is to prevent "the development and application of a body of 'secret law.'" *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 556 (1st Cir. 1992). In general, Exemption 7(E) likely creates little or no risk of secret law because for most agencies creating records for law enforcement purposes, there is an inherent separation between (1) investigative techniques, procedures, and guidelines and (2) legal standards or rules of adjudication. For example, classic law enforcement and prosecutorial agencies gather evidence about crimes and initiate cases against alleged perpetrators, but courts are tasked with adjudicating those cases by interpreting and applying legal standards during public proceedings and through public orders. *See, e.g.*, *ACLU v. Dep't of Just.*, No. 12 CIV. 7412 WHP, 2014 WL 956303, at *7 (S.D.N.Y. Mar. 11, 2014) (noting in the context of Exemption 5 that withholding Department of Justice legal memoranda would not constitute secret agency working law because "the DOJ's interpretation of the Supreme Court's decision . . . has no legal effect; the results of the DOJ's arguments will be borne out in the courts").

For many years, courts have applied Exemption 7(E) to certain records from other agencies beyond the classic law enforcement agencies, such as the Internal Revenue Service, including in the context of fraud detection methodologies. *See e.g.*, *Wishart v. Comm'r of IRS*, No. 97-20614 SW, 1998 WL 667638, at *6 (N.D. Cal. Aug. 6, 1998) (approving withholding descriptions of Discriminant Function scores "used by the IRS for

the selection of tax returns for examination" because disclosure would pose a significant risk of circumvention of the law because taxpayers could manipulate their return information so as to avoid examination").  Perhaps because civil enforcement agencies like the IRS (and ultimately courts) apply public legal standards to any resulting dispute or alleged violation, courts applying Exemption 7(E) in such cases generally have not raised concerns about the creation of secret law regarding screening or auditing methods used to select or filter the large number of filings for further investigation.

Defendant emphasizes that several courts have applied the same logic in cases challenging the withholding of fraud indicators in the immigration context.  *See Cath. Legal Immigr. Network, Inc. v. United States Citizenship & Immigr. Servs.*, No. TJS-19-1511, 2020 WL 5747183, at *13 (D. Md. Sept. 25, 2020) ("Because release of the document would disclose how the Agency considers fraud indicators, creating a risk of circumvention of the law, the Court finds that the document was properly withheld"); *Iraqi Refugee Assistance Project v. Dep't of Homeland Sec.*, No. 12-CV-3461 (PKC), 2017 WL 1155898, at *6 (S.D.N.Y. Mar. 27, 2017) (finding Exemption 7(E) applicable to measures aimed at detecting applicant fraud, "including accounts from a specific refugee population concerning the conduct of family members and other details so similar that refugee officers concluded that they were likely attempts at immigration fraud," because advanced knowledge "may cause applicants to tailor their statements in order to avoid detection"); *American Immigration Lawyers. Ass'n v. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 79 (D.D.C. 2012) (disclosure of agency's fraud indicators within visa review process "would provide a 'roadmap' or 'guidance' to those looking to circumvent the law").

Nevertheless, Plaintiff's argument about the potential for secret law is not without merit. Defendant's role regarding immigration law is in some respects comparable to that of classic law enforcement and other civil enforcement agencies: Defendant collects information about individuals and refers some cases for prosecution or further proceedings within other agencies and adjudicative bodies. Defendant's role, however, also differs in at least one important way: Defendant itself adjudicates various types of applications and confers immigration benefits depending on the results of its own proceedings. *See Akwasi Agyei v. Holder*, 729 F.3d 6, 10 (1st Cir. 2013) ("USCIS adjudicates the petition and determines whether it should be approved"); *Lena v. U.S. Atty. Gen.*, 578 F. App'x 828, 831 (11th Cir. 2014) (describing legislative history transferring from INS to Defendant powers over "adjudications of asylum and refugee applications") (quoting 6 U.S.C. § 271(b)); Congressional Research Service, *U.S. Citizenship and Immigration Services: Authorities and Procedures* 1, 5 (2020) (summarizing laws under which Defendant is primarily "tasked with adjudicating immigration benefit applications" whereas Immigration and Customs Enforcement and Customs and Border Protection are the two agencies within the Department of Homeland Security that are "primarily responsible for . . . immigration enforcement activities," but also noting that Defendant "has some immigration enforcement and related functions," including through the Fraud Detection and National Security directorate).

In the context of Defendant's asserted law enforcement purpose of identifying immigration fraud, and because the functions of the agency are especially mixed, and given the text of the exemption and the core purposes of the overall statute, a court should be

mindful of the distinction between (1) standards of adjudication or factors an agency applies explicitly or in practice when deciding cases, and (2) methods of allocating investigative or prosecutorial resources by screening or selecting among a larger number of applications to determine whether more information is needed or whether further checks should be made.  While the information in the second category is analogous to the kind of information courts have determined agencies may withhold, there is sound reason not to interpret Exemption 7(E) to allow Defendant to withhold the standards generally used in the adjudicatory process.  Otherwise, the applicable law would be secret, which would be contrary to a core purpose of FOIA.

Defendant thus may withhold materials used to investigate or collect information regarding immigration fraud, but it may not withhold materials it uses to define immigration fraud and what immigration fraud looks like in certain circumstances. There is no reason to conclude that agency records fall within the exemption for techniques, procedures, or guidelines for law enforcement investigations or prosecutions if the information is used to determine the rights or benefits of individuals, including "interpretations which [the agency] actually applies to cases before it," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (1971)), and "materials that define standards for determining whether the law has been violated." *PHE, Inc. v. Dep't of Just.*, 983 F.2d 248, 252 (D.C. Cir. 1993).[12]

---

[12] At least one court has concluded there is no "freestanding" secret law doctrine outside the context of Exemption 5.  *ACLU*, 2014 WL 956303, at *8 (approving withholding of DOJ memoranda under

a.    *Summaries of Fraud Issues, Burundi and Rwanda Fact Sheets (Bates Nos. 3765, 3940–43, 3944–45)*

Defendant withheld summaries "provided to Asylum Officers that describe[ ] fraud issues and trends that Asylum Officers are encountering in interviews and cases" which were provided "so that they could watch for similar issues in their cases." (*Vaughn* Index at 5–6.) The country information "is specific to fraud patterns and factors that Asylum Officers should be aware of when adjudicating applications." (*Id.* at 8–10.) According to Defendant, the identified patterns "if disclosed, would reveal the types of factors

Exemption 7(E) because they lacked force and effect of law and the agency's positions would be settled in subsequent court proceedings). The "secret law" or "working law" principle is recognized as a well-developed doctrine within Exemption 5 due to its central relevance to the analysis of the deliberative process privilege. There is no equivalent well-developed doctrine within any other exemption. Many courts, however, have considered the issue of secret law when interpreting the statutory language of other exemptions, including Exemption 7(E). *See Dep't of Air Force v. Rose*, 425 U.S. 352, 369 (1976) (discussing disclosure requirement of "secret law bearing directly on the propriety of actions of members of the public" within discussion of Exemption 2); *Patterson v. I.R.S.*, 56 F.3d 832, 838 (7th Cir. 1995) (rejecting district court's approval of agency's withholding and noting within the analysis of Exemption 6 that an agency's "unwritten law" is "exactly the type of information the FOIA is designed to disclose") (citing discussion of secret law in *PHE*, 983 F.2d at 252); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858, 868 (D.C. Cir. 1980) (applying Exemption 5 and Exemption 7(A)); *Berg v. Commodity Futures Trading Comm'n*, No. 93 C 6741, 1994 WL 1656067, at *6 n.3 (N.D. Ill. June 23, 1994) (noting that "[m]aterials that define standards for determining whether a law has been violated are not covered by exemption (b)(7)(E)" and approving withholding of memoranda under Exemption 7(E) because "[t]here is nothing to indicate that these materials contain 'secret laws' or regulations as plaintiff suggests they do").

The reasoning in *PHE, Inc. v. Dep't of Just.*, 983 F.2d 248 (D.C. Cir. 1993), is instructive. Pursuant to Exemption 7(E) (and the similar interpretation of Exemption 2 that was later overruled), the D.C. Circuit approved of the FBI's withholding of a training manual containing explanations of "sources of information" and "patterns of criminal activity to look for when investigating certain violations" because release of the guidelines would enable violators to know how the FBI would investigate individuals' activities, including who would be interviewed and what records would be reviewed, which information would enable violators to inhibit the investigative efforts. *Id.* at 251. In contrast, the D.C Circuit concluded that a unit within the Department of Justice failed to establish that Exemption 7(E) applied to portions of a manual containing a digest of search and seizure law and a discussion of useful caselaw on the crimes the unit was investigating. *Id.* at 251–52. The court considered the purpose of eliminating secret law and reasoned that public understanding of the applicable law "could lead to compliance with, rather than risk circumvention of, the law." *Id.* at 252 (citing *Hawkes v. IRS*, 507 F.2d 481, 483 (6th Cir.1974)).

considered when determining whether an application may have factors indicating fraud" and "would put individuals on notice as to what information is considered as part of the adjudication and screening process and could result in them not disclosing that information to law enforcement or immigration officers."  (*Id.* at 5–6, 8–10.)[13]

Defendant's explanation is insufficient to determine whether the patterns and trends merely direct investigative efforts by calling for asylum officers to collect additional information in certain circumstances, which would be covered by Exemption 7(E), or whether the patterns constitute factors the asylum officers are instructed to consider when adjudicating cases, meaning when the officer determines whether an applicant lacks credibility or whether an application is fraudulent, which would not be covered by Exemption 7(E).  An in camera review of those documents, therefore, is necessary to determine whether any of the withheld information is not covered by Exemption 7(E) and is segregable from the covered information. *See Grey v. Cuccinelli*, No. 9:18-CV-01764-

---

[13] Certain statements, including this one, were repeated in many entries because the fraud detection purpose served as the foundation for many of Defendant's determinations that the information constituted a technique, procedure, or guideline for law enforcement investigations or prosecutions and that there was a risk of circumvention of the law.  Many entries also asserted that disclosure of the withheld material:

> would put individuals on notice as to what information is considered as part of the adjudicative screening process and could result in them not disclosing that information to law enforcement or immigration officers. The disclosure of this information would reveal guidelines and procedures for the enforcement of certain immigration and national security laws and directives, and could reasonably be expected to risk the circumvention of law and render the relevant guidelines useless.

(*See*, *e.g.*, *Vaughn* Index at 8–9.)  While Defendant need only logically show how disclosure would risk circumvention of the law, an agency's mere assertion that there is a risk of circumvention of the law is not controlling nor sufficient to justify the withholding of the information.  When describing the withheld materials for each of the subsequent invocations of Exemption 7(E), I attempted to include the most relevant portions of the descriptions of the documents and of the asserted risk. I largely omitted the repeated statements and the more conclusory allegations or formulaic recitations of the exemption.

36

DCN, 2020 WL 3104744, at *8 (D.S.C. June 11, 2020) (insufficient information to justify

USCIS's Exemption 7(E) withholding of statistics, trends, indicators of marriage fraud).[14]

> b.  *Credibility Determinations Training (Bates Nos. 4105–11, 4113, 4939-45, 4947)*

Defendant withheld from training documents "specific examples from asylum

applications and interview that reflected issues where credibility was lacking." (*Vaughn*

Index at 10, 19.)  The purpose was to "instruct Asylum Officers on which specific patterns

and factors that Asylum Officers should be aware in order to better identify potential

credibility issues and other issues relevant to the screening of applications to make an

eligibility determination." (*Id.* at 11.)  The exemplar fact patterns evidently are not tools

to collect information or allocate investigative or prosecutorial resources, but rather

constitute guidance for making eligibility decisions and determining if an application is

fraudulent or should be denied for lacking credibility.  Defendant's description bears a

strong resemblance to the role of caselaw or "materials that define standards for

determining whether the law has been violated." *See PHE,* 983 F.2d at 252.  Because

Defendant's description resembles criteria for making a binding legal determination about

an individual's rights or benefits, Defendant's description does not describe a technique,

procedure, or guideline for law enforcement investigations or prosecutions, and the

information is not within the exemption.

---

[14] The court subsequently resolved many the disputed documents in differing directions after in camera review.  *Grey v. Cuccinelli*, No. 9:18-CV-01764-DCN, 2021 WL 914245, at *7 (D.S.C. Mar. 10, 2021)

Defendant also withheld "specific examples of how questions should be worded based on actual factual scenarios . . . as well as ways to use interview questions to elicit testimony to reflect whether or not the information provided by the applicant is credible." (*Id.* at 10, 19–20.)  The information regarding specific questions asked and tactics used during questioning might represent an investigative technique, procedure, or guideline, and there is a logical risk of circumvention from disclosure because it would allow applicants to prepare answers in advance and thus make it more difficult to distinguish between legitimate and fraudulent applications.  *Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs.*, 30 F.4th 318, 331–33 (2d Cir. 2022) (set of questions used dynamically to identify connections to terrorist organizations were covered by Exemption 7(E) because disclosure would allow applicants to tailor answers to avoid detection, even though certain questions are regularly disclosed to individual applicants during their interviews).[15]

However, to the extent the information regarding the interview questions includes recommended conclusions or legal determinations that Asylum Officers should draw about a hypothetical applicant's credibility and their entitlement to asylum benefits in exemplar fact patterns and given certain responses, that additional information more closely

---

[15] In *Knight*, the Second Circuit rejected a distinction within the Exemption 7 threshold inquiry regarding "law enforcement purposes" between documents compiled to help an agency "apply" the law and documents compiled to "enforce" the law.  *See Knight*, 30 F.4th at 328–29 ("Enforcing the law always requires a degree of analysis and application").  I am not persuaded, however, that the court's view of the threshold inquiry of Exemption 7 undermines the distinction within Exemption 7(E) between the law applied during adjudications on the one hand and law enforcement techniques, procedures, and guidelines on the other.

resembles legal guidance for Asylum Officers or "interpretations which [the agency] actually applies to cases before it," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980), which should not be interpreted to constitute an investigatory or prosecutorial technique, procedure, or guideline.  An in camera review of the documents, therefore, is necessary to determine whether any of the withheld information regarding questioning is not covered by Exemption 7(E) and is segregable from the covered information.

c.      *FDNS Training (Bates Nos. 4123–30, 4132–33, 4135, 4137–4141)*

Defendant withheld from a training document (1) details about FDNS's role, including "files and application types FDNS pre-screens for criminal activity, national security concerns, fraud, or other factors required FDNS review, such as country, age, or other factual patterns," (2) information about the FDNS coordination process, including "terminology used by FDNS," (3) links to an "intranet website used by FDNS" to document screening procedures and other FDNS database descriptions, (4) knowledge check examples and database screenshots.  (*Vaughn* Index at 12–14.)  Defendant's description is sufficient to establish that Exemption 7(E) covers the withheld information.  There is nothing to suggest that disclosure would provide insight into or reveal standards used to determine eligibility for benefits.  Furthermore, the technical database information and pre-screening factors for heightened scrutiny appear to be similar to the information courts have concluded were within the exemption in other contexts.  Logic also suggests the possibility that disclosure of the database information and pre-screening selection criteria would allow some fraudulent applicants to sidestep those measures or exploit limitations

in those systems to avoid detection.  Defendant's withholding pursuant to Exemption 7(E) was permissible.

> ### d.    Email Dated August 28, 2018 (Bates Nos. 4194–4195)

Defendant withheld an email between several employees of the Newark Asylum Office to one employee located in the RAIO's headquarters advising that an FDNS officer had "identified some security check errors" during the time the officer worked as an acting Supervisory Asylum Officer.  (*Vaughn* Index at 15.)  Defendant asserts disclosure would reveal "certain screening methods and background vetting" that FDNS undertakes and the databases used for the background check process, "typographical issues that impact screening," and "inefficiencies that lead to the inability to properly screen and vet applications. . . ."  (*Id.* at 15–16.)  The details about background and security checks represent investigative techniques procedures and guidelines and there is no risk of secret law because the email does not represent instructions or interpretations for asylum officers to apply when making benefits determinations.  Defendant's description adequately explains how disclosure would risk circumvention of the law because individuals could potentially gain the ability to hide certain information to obtain less scrutiny or exploit the vulnerabilities of FDNS's investigative processes to avoid Defendant's efforts to gather information about applicants.  Exemption 7(E) thus covers the withheld information.

> ### e.    SPLIT/CREDIBILITY Totality of the Circumstances Training (Bates No. 4319)

Defendant withheld the "name of a specific ethno-religious group that had recently been identified as involving a lot of recent cases with credibility issues."  (*Vaughn* Index

40

at 16–17.)  Defendant evidently uses affiliations with certain organizations or groups not only to determine whether applicants "may need additional screening," (*id.* at 17)—which is somewhat similar to screening or selection factors for additional scrutiny to which courts have applied Exemption 7(E)—but also "in determining the applicant's entitlement to immigration benefits."  (*Id.*).  To determine whether the withheld information is more akin to a practical legal standard or a technique, procedure, or guideline for investigating or prosecuting crimes, an in camera review is appropriate.

> f.  *Effective Interviewing and Best Practices Training (Bates Nos. 4669, 4677–87)*

Defendant withheld from a Boston Office training document information relating to different application types, including "certain specific factors to be aware of, documents that are needed for proper screening and vetting, and specific background checks that should be conducted . . . including the names of the databases . . . and what results to look for."  (*Vaughn* Index at 17–18.)  Defendant also withheld "specific questions Officers should use to elicit information to confirm credibility."  (*Id.* at 18.)  Exemption 7(E) justifies Defendant's withholding of the information required for vetting, that reflects the background checks that should be conducted, and that includes the databases used during certain kinds of background checks.  Defendant's description of other content within the training document, including "certain specific factors to be aware of" is too generic and vague for the Court to determine whether Exemption 7(E) applies.  Likewise, the information regarding questions to ask during interviews likely fall within Exemption 7(E), but related conclusions could be unprotected, and the Court needs more information to

determine if there is segregable unprotected information.   Accordingly, an in camera review of the documents is necessary to determine whether any of the withheld information regarding questioning is not covered and is segregable from the covered information.

g.   *TRIG Emails related to Burundi (Bates Nos. 5481–82, 6103–04)*

Defendant withheld from two email messages information about an organization and country that were "being reviewed for potential [TRIG] issues." (*Vaughn* Index at 20, 37.)  The emails advised certain employees about the findings of other law enforcement agencies and explains how the "information impacts vetting and screening procedures for related applicants." (*Id.* at 21, 38.)  Defendant's descriptions suggests that the potential information received about TRIG issues was used as a selection factor for additional scrutiny of certain applications, and not a factor in making benefits decisions.  Defendant explains that public knowledge of the vetting and potential TRIG findings could allow certain applicants not to disclose connections to suspect groups and thus avoid scrutiny. Defendant's explanation is adequate to justify withholding the email content under Exemption 7(E).

h.   *Email Dated June 5, 2018 (Bates No. 5490)*

Defendant withheld an email containing "detailed specific procedures related to specific countries and a particular fact pattern that multiple asylum officers had reported in their cases." (*Vaughn* Index at 22.)  While the description is somewhat vague, Defendant clarified that the email raised the topic to "discuss how this information impacts vetting and screening procedures for related applicants," (*id.*) which suggests the information did not constitute instructions for asylum officers to use when making benefits determinations.

Defendant's explanation regarding the potential for applicants to avoid heightened scrutiny is therefore sufficient to invoke Exemption 7(E).

> i.    *Credibility Training (Bates Nos. 5707, 5709)*

Defendant withheld from a training document information about "how Country of Origin Information (COI) should be used as part of adjudication." (*Vaughn* Index at 24.) According to Defendant, "COI provides Asylum Officers with credible and objective information on human rights and country conditions to use to assist in adjudicating asylum applicants' claims, and to help assess credibility and consistency of an applicants' statements with other evidence of record related to COI," and "[t]he withheld information includes specific details pertaining to accumulated COI data related to specific countries, examples of how this information was used when adjudicating a specific applicant, and how it impacted that specific credibility finding." (*Id.* at 24–25.) Defendant acknowledges that the information constitutes facts and criteria used to make benefits determinations. The information thus bears little resemblance to the methods of investigating and prosecuting crimes that Exemption 7(E) covers.

Defendant also fails to refute Plaintiff's argument that there is no credible risk of circumvention of the law if the public learns about the agency's views regarding facts on the ground in certain countries, especially given that it can be of no real surprise that Defendant considers reports of facts collected about other nations when deciding whether an applicant is candid about the conditions in the country. The fact that outside information is relevant to the adjudication of applications underscores Plaintiff's and the public's interest in the accuracy of the information. The very core purpose of FOIA, therefore, is

implicated.  Furthermore, because Defendant does not dispute that the country of origin is not easily changed without detection, the way disclosure would aid fraudulent applicants in avoiding detection is difficult to discern.

In short, Defendant has failed to establish that the withholding of the pages can be justified under Exemption 7(E), and Plaintiff is entitled to the information.

> j.    *Assessment to Refer Forms (Bates Nos. 5868-5869, 5876-5877, 5880-5881, 5905-5907, 5959, 6053, 6065-6067)*

Defendant withheld completed forms from prior applications used "to document the background information and analysis of cases that are referred to the Immigration Court for adjudication." (*Vaughn* Index at 25).  "[T]hese Assessments were specifically selected as examples to provide to USCIS Asylum Officers as part of training . . . on issues related to credibility determinations, eliciting testimony, and other significant adjudicative issues that are relevant to whether an individual is eligible for the benefit sought." (*Id.* at 26.) According to Defendant, "[t]he withheld information highlights factors or factual patterns that Asylum Officers should be aware of to indicate that credibility issues may be involved in an application." (*See e.g.*, *id.* at 27.)

Defendant's explanation suggests some of the information, specifically that related to strategies for eliciting testimony, is properly withheld pursuant to Exemption 7(E).  The description also suggests that some of the information is not within what Exemption 7(E). The pages evidently also include guidance and instructive cases provided to officers for their use when adjudicating cases and deciding whether an applicant is credible and therefore whether the applicant is entitled to benefits.  An in camera review of the

documents, therefore, is necessary to determine whether any of the withheld information is not covered by Exemption 7(E) and is segregable from the covered information.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court: (1) grant summary judgment in favor of Plaintiff and order Defendant to disclose the information it withheld pursuant to Exemption 6 except for email addresses, phone numbers, applicant names, addresses, names of relatives, addresses of relatives, school addresses, dates of significance related to important events within the applicant's personal history, churches attended, and other family and/or personal history; (2) grant summary judgment in favor of Plaintiff regarding the Exemption 7(E) withholdings on pages 4319, 5707, and 5709; and (3) grant summary judgment in favor of Defendant on the remaining issues and disputed pages.

In addition, as to the remaining Exemption 7(E) issues, I order Defendant to submit, on or before June 7, 2022, the documents containing the following pages for in camera review: 3765, 3940–43, 3944–45, 4105–11, 4113, 4319, 4939-45, 4947, 4669, 4677–87, 5868-5869, 5876-5877, 5880-5881, 5905-5907, 5959, 6053, 6065-6067.  Upon review of the documents, I will issue a supplemental recommended decision.

Because I have directed Defendant to submit documents for an in camera review and because I will issue a supplemental recommendation following the review, the time for parties to file objections to the recommendations made in this decision is stayed.  In the supplemental recommended decision, I will establish a deadline for the parties to file

objections to the recommendations in this decision and the supplemental recommended decision.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 31st day of May, 2022.